STATE OF MINNESOTA

IN SUPREME COURT

A23-1973

Tax Court

Dakota Drug, Inc.,

        Respondent,

vs.

Commissioner of Revenue,

        Relator.

Moore, III, J.
Took no part, Hudson, C.J., Gaïtas, J.

Filed: November 6, 2024
Office of Appellate Courts

———————————————

Keith Ellison, Attorney General, Jennifer A. Kitchak, Assistant Attorney General, Saint Paul, Minnesota, for relator.

Masha M. Yevzelman, Lynn S. Linné, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for respondent.

———————————————

S Y L L A B U S

Under Minn. Stat. § 295.52, subd. 3 (2018), "gross revenues" does not include rebate amounts paid to a wholesale drug distributor's customer pursuant to a rebate agreement.

Affirmed.

1

O P I N I O N

MOORE, III, Justice.

Respondent Dakota Drug, Inc. ("Dakota Drug") is a wholesale drug distributor subject to the Wholesale Drug Distributor Tax—a tax which partially funds Minnesota's subsidized health care program, MinnesotaCare. *See generally* Minn. Stat. ch. 256L (2022). This case concerns whether amounts that were invoiced to Dakota Drug's customers for the purchase of wholesale legend drugs—but were either credited to the customer's account or returned via check pursuant to a rebate agreement—must be included in its "gross revenues" for purposes of the Wholesale Drug Distributor Tax. Minn. Stat. § 295.52, subd. 3 (2018). The tax court, considering the definition of "gross revenues" as "total amounts received in money or otherwise," Minn. Stat. § 295.50, subd. 3 (2018), determined that Dakota Drug did not "receive" the rebate amounts because it was contractually obligated to pay the amounts to customers once the rebates were earned. Accordingly, the tax court granted summary judgment in favor of Dakota Drug. Because we conclude that Dakota Drug did not "receive" rebate amounts for purposes of the Wholesale Drug Distributor Tax, we affirm.

**FACTS**

The facts in this case are undisputed. Dakota Drug is a North Dakota corporation with its principal place of business in Anoka. Dakota Drug operates as a wholesale drug distributor selling "legend drugs"[1]—including generic prescriptions ("generic Rx") and

---

[1]    "Legend drugs" are drugs that require a prescription under federal law. *See* Minn. Stat. § 295.50, subd. 15 (2022).

2

brand name prescriptions ("brand Rx")—as well as over-the-counter medications, to smaller pharmacies, retail drug stores, hospitals, and veterinarians. Dakota Drug's gross revenues from selling legend drugs are subject to the Wholesale Drug Distributor Tax found in Minn. Stat. § 295.52, subd. 3 (2018).[2] The dispute here centers around the effect, if any, of Dakota Drug's customer rebate program on its gross revenues. The mechanics of the rebate program are as follows.

The wholesale drug distribution market is highly competitive, and as such, many wholesale drug distributors—including Dakota Drug—utilize rebate programs to attract and maintain customers. Dakota Drug enters into written agreements with customers that set out the terms and conditions for the rebate program. Dakota Drug uses two distinct agreement forms—Rebate Agreements and Primary Supply Agreements. The agreements offer very similar benefits, and both entitle customers to monthly, and sometimes quarterly, rebates on generic Rx purchases and brand Rx purchases.

The rebate amounts are calculated based on an agreed upon percentage of the customer's total purchases of both generic Rx and brand Rx from the previous month; as a result, the rebate amount fluctuates as the customer's purchase amount fluctuates. The rebate percentage for generic Rx is standard for all customers, but the brand Rx percentage varies from customer to customer. In addition, customers with Rebate Agreements (as

---

[2]    In 2019, the Legislature amended the Wholesale Drug Distributor Tax to require a tax equal to 1.8 percent of gross revenues. Act of May 30, 2019, ch. 6, art. 9, § 5, 2019 Minn. Laws 138, 140 (codified as amended at Minn. Stat. § 295.52, subd. 3 (Supp. 2019)). At all times relevant to this appeal, the tax rate was 2 percent. Minn. Stat. § 295.52, subd. 3 (2018).

opposed to Primary Supply Agreements) are also eligible for an additional quarterly rebate based on the customer's "Generic Compliance Ratio." This ratio is a percentage calculated as follows:

$$\frac{(\text{Customer's Purchases of } \textbf{Generic Rx})}{(\text{Customer's Purchases of } \textbf{Brand Rx}) + (\text{Customer's Purchases of } \textbf{Generic Rx})}$$

When Dakota Drug fulfills an order, it sends the customer an invoice. These invoices state the full price of each product and the applicable MinnesotaCare tax associated with each product. Customers have numerous invoices—often hundreds—during a monthly or bi-monthly pay period. These invoices do not include any calculation of the earned rebate amount.

Customers do not pay individual invoices as they are received. Rather, at the end of each pay period, the customer receives an account statement that aggregates the invoices into a total account balance and calculates the rebate amount based on the customer's purchase amount and monthly Generic Compliance Ratio. The customer is ultimately responsible for the total account balance minus the total rebate amount. Customers who receive rebates via account credit will receive a monthly statement summarizing their invoices and credits—the rebate is then applied to the customer's total account balance. Customers who receive rebates via check pay the full account balance and then receive a check for the rebate amounts. If a customer is past due on their account, the rebate amount will be applied to the past due amount.

4

The Primary Supply Agreements provide that "no rebates will be paid in the event Customer is not maintaining the Primary Supplier Commitment *as of the issue date of the rebates*." (Emphasis added.) The Rebate Agreements have an identical requirement that the customer use Dakota Drug as its primary wholesaler "*at the time the rebate is due*." (Emphasis added). During the tax years at issue, Dakota Drug did not apply these primary supplier provisions against any customer. However, if a rebate was not paid because a customer failed to meet the primary supplier requirement, Dakota Drug would include the full invoiced amounts in its gross revenues.

Dakota Drug posts every invoice and every rebate to its general ledger account. At the end of the relevant tax filing period, Dakota Drug reports its "gross revenues" as all invoiced amounts minus all rebate amounts. Dakota Drug also subtracts all refunds given to customers for returned products. After the "gross revenue" is calculated, Dakota Drug then deducts the only available statutory exclusion for drug wholesalers—revenue from sales to veterinarians. *See* Minn. Stat. § 295.53, subd. 1(c) (2022).

Dakota Drug timely filed tax returns from 2016–2019, the tax years at issue in this case. In those returns, Dakota Drug did not include the rebate amounts from its reported gross revenues. Following an audit of Dakota Drug's tax returns, on September 15, 2021, the Commissioner of Revenue issued a tax order assessing additional tax plus interest, totaling more than $500,000. The Commissioner concluded that Dakota Drug incorrectly deducted the rebate amounts from its reported gross revenues under Minn. Stat. § 295.52, subd. 3, and as a result, assessed tax for the *full invoiced amounts* sent to customers. Dakota Drug appealed the Commissioner's assessment to the tax court.

5

Before the tax court, the parties filed cross-motions for summary judgment. Dakota Drug emphasized that Minn. Stat. § 295.50, subd. 3, defines "gross revenues" as the "total amounts *received* in money or otherwise," and argued that it never "received" the rebate amounts because it was contractually obligated to return the rebates to customers, either by account credit or check. The Commissioner, on the other hand, asserted that because Dakota Drug pays rebates to customers who meet certain purchase commitments in the month or quarter *after* the purchase is originally made, Dakota Drug does, in fact, "receive" the full invoiced amounts.

The tax court granted summary judgment in favor of Dakota Drug. The tax court concluded that rebate amounts paid to customers do not constitute gross revenues for purposes of the Wholesale Drug Distributor Tax—regardless of whether the rebates are received by account credit or by check. Applying the dictionary definition of "receive," the tax court found that Minn. Stat. § 295.52, subd. 3, unambiguously requires the taxpayer to "come into possession of" the amounts reported as gross revenue. Because the agreements are non-discretionary and entitle the customer to receive the rebates once earned, the tax court determined that Dakota Drug "[p]lainly . . . does not come into possession of rebate amounts . . . ." Rather, when Dakota Drug pays a rebate, it is paying money that it *owes* to the customer in exchange for the purchase of prescription drugs under the Agreements.

The Commissioner appealed to this court.

# ANALYSIS

"We review a tax court's order granting summary judgment to determine whether the tax court erred in applying the law and whether any material facts are disputed." *Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 777 (Minn. 2013) (citation omitted) (internal quotation marks omitted). Because the material facts here are undisputed, "the only question before us is whether the tax court correctly applied Minnesota law." *Id.* The tax court's conclusions of law and interpretation of statutes are reviewed de novo. *YAM Special Holdings, Inc. v. Comm'r of Revenue*, 947 N.W.2d 438, 441 (Minn. 2020).

Minnesota Statutes section 295.52, subdivision 3, imposes a tax on the "gross revenues" of wholesale drug distributors. The Legislature enacted this tax in 1992, among similar taxes for hospital centers, surgical centers, and health care providers, to fund MinnesotaCare. Act of Apr. 23, 1992, ch. 549, art. 9, § 7, 1992 Minn. Laws 1487, 1613 (codified at Minn. Stat. § 295.52 (1992)). During the tax years at issue, the Wholesale Drug Distributor tax was equal to 2 percent of gross revenues. Minn. Stat. § 295.52, subd. 3 (2018).

The Wholesale Drug Distributor tax is an aggregate tax based on the wholesaler's "gross revenues," rather than a transactional tax based on individual purchases of wholesale drugs. Minnesota Statutes section 295.50, subdivision 3 (2022), defines "gross revenues" as "total amounts received in money or otherwise." In calculating the taxable gross revenues, Minn. Stat. § 295.53, subd. 1(c) (2022), allows only one deduction for wholesale drug distributors: amounts received "for legend drugs sold directly to veterinarians or veterinary bulk purchasing organizations . . . ."

7

A.

We begin by interpreting the plain meaning of "gross revenues," defined in Minn. Stat. § 295.50, subd. 3, as "total amounts received in money or otherwise." "On questions of statutory interpretation, our objective is to effectuate the Legislature's intent." *Hibbing Taconite Co. v. Comm'r of Revenue*, 958 N.W.2d 325, 329 (Minn. 2021). "The plain language of the statute is our best guide to the Legislature's intent." *Cities Mgmt., Inc. v. Comm'r of Revenue*, 997 N.W.2d 348, 354 (Minn. 2023) (citation omitted) (internal quotation marks omitted). If the meaning of the statute is unambiguous, the plain language of the statute controls. *Id*. at 354–55. But "[i]f the statutory language is subject to more than one reasonable interpretation, it is ambiguous and we look to other interpretative tools to assist our inquiry into legislative intent." *Id*. at 355. The court construes statutory words and phrases "according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2022). Dictionary definitions are among the tools available to assist our inquiry into the plain meaning of a statute. *State v. Beganovic*, 991 N.W.2d 638, 643 (Minn. 2023).

The parties put forth conflicting interpretations of the phrase "total amounts received in money or otherwise." Dakota Drug argues that rebate amounts paid to customers are never actually "received," because Dakota Drug is contractually obligated to return the amounts to the customer. When rebates are paid via account credits, Dakota Drug reduces the customer's account balance by eliminating its own payment obligation to the customer. When rebates are paid via check, Dakota Drug essentially refunds the customer the applicable "overpayment" after the customer pays the full invoice

8

balance. In the Commissioner's view, Dakota Drug's interpretation effectively changes the plain statutory language from "gross revenues" to "net revenues" by allowing deduction of the rebate amounts from the amounts invoiced to its customers. According to the Commissioner, Dakota Drug "receives" the full invoiced amounts when (1) the customer pays the full invoiced amount for rebates paid via check, and (2) the customer uses the rebate credit to purchase more legend drugs later for rebates paid via account credit.

Our analysis begins with the plain meaning of the words "total amounts received in money or otherwise." *See* Minn. Stat. § 295.50, subd. 3. "Total" as an adjective is defined as "comprising or constituting a whole" or "entire." *Total*, *Merriam Webster's Collegiate Dictionary* 1320 (11th ed. 2014). When used as a noun, "total" means "a product of addition" or "an entire quantity." *Id.* It follows that the reference to "total amounts" in Minn. Stat. § 295.50, subd. 3, means the *added, entire* amounts received.

Next, "received" ordinarily means "to come into possession of" or "acquire." *Received*, *Merriam Webster's Collegiate Dictionary* 1038 (11th ed. 2014). It is also defined as "to get from some outside source." *Receive*, *Black's Law Dictionary* 1460 (10th ed. 2014). Therefore, under the ordinary meaning of Minn. Stat. § 295.50, subd. 3, a taxpayer's "gross revenues" are the "total amounts" that the taxpayer comes into possession of or gets from some outside source "in money or otherwise."

Finally, "otherwise" means "something or anything else" or "something to the contrary." *Otherwise*, *Merriam Webster's Collegiate Dictionary* 879 (11th ed. 2014); *see also Otherwise*, *Black's Law Dictionary* 1276 (10th ed. 2014) (defining "otherwise" as "[i]n a different way; in another manner"). It then follows that "otherwise," read in the

9

context of its antecedent, "total amounts received in money or," refers to non-monetary benefits or tangible goods that a wholesale drug distributor receives from a third party, perhaps as a part of a bartered transaction.

Taking these definitions together, we conclude that the plain meaning of "gross revenues," defined as "total amounts received in money or otherwise," is the entire amount that a taxpayer comes into possession of either through money or non-monetary benefits and goods. Furthermore, for something to be included in a taxpayer's "gross revenues," the taxpayer must have come into possession of an amount from a third-party.

B.

We next apply the proper definition of "total amounts received in money or otherwise" to the facts here. Specifically, we consider whether the rebate amounts Dakota Drug paid to its customers constitute part of the "total amounts received in money or otherwise" that must be included in "gross revenues" for purposes of the Wholesale Drug Distributor Tax.[3]

The parties agree that Dakota Drug does not have discretion in paying the rebate amounts to customers once earned; there is a contractual obligation to credit customers'

_____

[3] At the outset, we note that the parties separate their arguments concerning rebates paid via check and rebates paid via account credit. Although the parties make reasoned arguments for why the two types of rebates may be analytically different, we do not find that any distinctions between the two are outcome determinative. As the tax court aptly stated, a rule that changes the tax treatment of rebate amounts under Minn. Stat. § 295.52, subd. 3, based on whether the customer chooses to receive the rebate via check or account credit could create absurd and unreasonable results. *See KSTP-TV v. Ramsey Cnty.*, 806 N.W.2d 785, 788 (Minn. 2011) ("When relying on the plain statutory text, we read words and phrases to avoid absurd results and unjust consequences." (citation omitted) (internal quotation marks omitted)).

accounts or send them a check. As a result, Dakota Drug cannot reasonably "come into possession of" or "get from some outside source" the rebate amounts that it is contractually obligated to pay out to customers. And therefore, the rebate amounts that Dakota Drug is contractually obligated to pay cannot constitute part of the "*total* amounts received in money or otherwise." Functionally, for rebates paid via check, Dakota Drug returned overpaid invoice amounts to customers via check. And for rebates paid via account credit, Dakota Drug functionally offered discounted prices through account credits. In neither circumstance were the rebates part of the "total amounts received in money or otherwise."

We reject the Commissioner's contention that "gross revenues" should be interpreted as "the full amounts invoiced" to Dakota Drug's customers. By defining "gross revenues" as "total amounts received in money or otherwise," the Legislature did not indicate a clear intention to require drug wholesalers to report the full invoiced amounts. *See Wayzata Nissan, LLC v. Nissan N. Am.*, 875 N.W.2d 279, 286 (Minn. 2016) ("When a word is defined in a statute, we are guided by the definition provided by the Legislature."). And by the Commissioner's own admissions, their interpretation of "gross revenues" as "the full invoiced amounts" has notable exceptions.

The Commissioner concedes that if a customer is given a refund for returned products—even if those products are invoiced and fully paid—the refund is not included in gross revenues. If Dakota Drug invoiced a customer, but the customer refused to pay the invoice, that amount would not be included in gross revenues. And if a product was sold at a specific discount listed on the invoice, only the discounted price would be included in gross revenues. But the Commissioner disputes that Dakota Drug did not "receive"

11

rebate amounts that it paid to its customers in the month following a purchase pursuant to a rebate agreement.

The Commissioner's interpretation of Minn. Stat. § 259.52, subd. 3, takes a form-over-substance approach and prioritizes the *method* in which a wholesale drug distributor reduces the purchase price of legend drugs. If Dakota Drug had calculated the rebate amounts at the invoice level and listed said amounts on each invoice, it appears the Commissioner would not object to Dakota Drug's exclusion of the rebate amounts from gross revenues. But this is a distinction without a difference. Dakota Drug is selling legend drugs at a reduced price and does not "receive" the full invoiced amount, regardless of whether it calculates rebates invoice-to-invoice or on a separate monthly statement. The Commissioner's interpretation of "gross revenues" as requiring Dakota Drug to report all invoiced amounts as "received"—even though Dakota Drug was not entitled to the full invoiced amount and was, in fact, contractually obligated to return the rebate amounts—is an unreasonable reading of the statute.

Notwithstanding the statutory language, the Commissioner also asserts that the tax court's decision in *HealthPartners, Inc. v. Commissioner of Revenue*, No. 6925, 1999 WL 123289, at *6–7 (Minn. T.C. Mar. 4, 1999), is apposite to the facts presented here. In that case, HealthPartners functioned as both a health care provider and health plan insurer that provided insurance to its own employees. *Id.* at *6. HealthPartners was subject to a tax based on its gross revenues as a health plan company—i.e., the amounts received as insurance premiums, copayments, deductibles, coinsurance, and fees for patient services. *Id.* at *2. In calculating its gross revenues, HealthPartners estimated the costs it would

12

have paid an arm's length health care provider for insurance for its employees and deducted amounts those employees would have paid as contributions for that estimated cost. *Id.* at *6–7. HealthPartners then included that amount in its gross revenues. *Id.*

The tax court determined that HealthPartners, acting as both an insurer and a health care provider, correctly included the value of the health insurance provided to employees in its gross revenues. *Id.* at *7. The tax court explained:

> If the two functions were two separate arm's length companies, HealthPartners, the health care provider, would have been paid by HealthPartners, the insurer for the services provided to the employees. That amount would have been taxable gross revenue to HealthPartners, the provider. Since they are one and the same entity, that cash transaction was forgone but the amount was nevertheless a benefit received.

*Id.* In other words, HealthPartners was receiving the benefits of a competitive health plan in recruiting and retaining employees, who then provided services for the company. *Id.* As a result, the value of the benefit was correctly characterized as "money or otherwise" and properly included in gross revenues for tax purposes. *Id.* The tax court concluded that HealthPartners' subsequent deduction of this amount on its tax returns was improper because such a deduction was not available under Minn. Stat. § 295.53, subd. 2 (2022). *Id.*

The Commissioner argues that *HealthPartners* is analogous to the facts here because Dakota Drug receives a benefit—customer loyalty—through the primary supply provisions in the rebate agreements. In the Commissioner's view, the value of the customer's loyalty is equal to the amount Dakota Drug pays out as rebates, and accordingly, the rebate amounts are "money *or otherwise*" that is received by Dakota Drug and included in its gross revenues. We disagree.

13

Even if the *HealthPartners* decision were binding on our court, which it is not, it is not factually apposite here. Although it is true that to receive a rebate, a customer must be using Dakota Drug as its primary supplier *at the time the rebate is issued*, the rebate agreements do not constitute a "customer loyalty program" as the Commissioner contends. Rather, Dakota Drug's rebate agreements entitle its customers to a rebate if they meet certain *historical* purchasing requirements, with no provision in the rebate agreements obligating customers to continue making purchases from Dakota Drug *in the future*. Dakota Drug therefore does not "receive" anything in exchange for the rebates in the same manner that HealthPartners received employee labor in exchange for the health care plan its corporate structure enabled it to provide. *See HealthPartners*, 1999 WL 123289, at *6–7. We therefore agree with the tax court that the *HealthPartners* case is not persuasive here.

For the reasons stated above, we hold that under Minn. Stat. § 295.52, subd. 3, "gross revenues" does not include rebate amounts paid to a wholesale drug distributor's customer pursuant to a rebate agreement. Accordingly, the tax court did not err in granting summary judgment in favor of Dakota Drug.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the tax court.

Affirmed.

HUDSON, C.J., took no part in the consideration or decision of this case.

14

GAÏTAS, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.